JOURNAL ENTRY AND OPINION
Defendants-appellants, Kenneth L. Mitchell and Woodling, Krost Rust, appeal the decision of the Cuyahoga County Common Pleas Court that granted a motion for a new trial filed by plaintiffs-appellees/cross-appellants, Ray Carabotta, Sr., Patio Den Inc., Made for Shade, Inc. and Shade Master, Inc. following a unanimous defense verdict on the latter's complaint for legal malpractice. Alternatively, appellants appeal the granting of a motion for partial summary judgment filed by third-party defendant-appellee, Oldham Oldham on appellants' third-party complaint for contribution. Appellees/cross-appellants, Carabotta and Patio Den, cross-appeal the decision denying their motion for judgment notwithstanding the verdict.
A review of the record reveals that, in February 1996, Carabotta was the owner of Patio Den and Made for Shade, the latter of which was a distributor of a "Papillon" style umbrella originally manufactured in France but also manufactured by an Italian company by the name of Arquati, Inc. Desirous of manufacturing this umbrella on his own in order to increase his profit, Carabotta approached defendant-appellant, Kenneth L. Mitchell, an intellectual property attorney with the law firm of defendant-appellant, Woodling, Krost Rust (collectively referred to as "Mitchell"), and requested that Mitchell perform a patent search for any relevant art that would hinder his ability to manufacture this type of umbrella. An employee of Carabotta, Christine Hren, corresponded with Mitchell and provided Mitchell with diagrams of the umbrella in question as well as the address of Arquati. She further stated:
 Unfortunately, I was unsuccessful in finding the address of the French company. I do know they are found all over France, French Riviara. (sic) The name they can most likely be found under is Jean-Collet.
Mitchell then engaged the services of Warren Low, a patent attorney with the Washington, D.C. law firm of Low Low, to perform an initial search. Mitchell forwarded the above correspondence to Low and requested that he investigate whether Arquati had any patents or any trade dress registration on this product in the United States.
Relying on the information provided by Low, Mitchell informed Carabotta that no relevant patent was identified and stated as follows:
 In conclusion, we did not locate a patent that would prohibit you from making, using or selling a competing product. Nevertheless, it is usually intelligent to make changes to the design of the product before making, using or selling it.
Mitchell then went on to explain the significance of trade dress and the product's capability of protection despite lack of registration. He reiterated the advice to "consider design changes and appearance changes" before manufacturing a competing product. While Carabotta testified to the contrary, Mitchell did not see Carabotta again until July 1996 when Mitchell met with Carabotta at Patio Den to discuss the particulars regarding a possible patent application on the umbrella Carabotta anticipated manufacturing. It was at this meeting that Mitchell learned that Carabotta intended to manufacture an identical copy of the Arquati/Papillon umbrella rather than design around it. It was also at this meeting that Mitchell claims he first saw a brochure for the Arquati/Papillon umbrella sold by Carabotta's company, Made for Shade, wherein the umbrella was advertised as "the only patented system." Armed with this information, Mitchell suggested that he travel to the Patent and Trademark Office ("PTO") in Washington, D.C. to personally perform a subject-matter search.
As part of this type of search, Mitchell testified that he "flipped through" approximately one thousand patents. From the testimony adduced at trial, patents issued by the PTO are classified and subclassified according to the area of art and the corresponding function and structure within that particular art. So classified, they are then stored in the public search room of the PTO in what is termed a "shoe," which is a type of shelving system for storing patents. Because a particular patent may contain many claims and corresponding drawings that cover the respective claims, the patent may be voluminous and not feasibly fit in its assigned "shoe." Known as a "jumbo patent," the shoe for such a patent would contain only the first or face page of the patent. The patent number, the date issued, the inventor's name and an abstract of the particular patent, inter alia, are typically contained on the face page. Also contained on the face page is a schematic drawing of the invention, which is chosen by the PTO as that which best exemplifies the claims covered by the patent. A subject-matter search comprises "flipping through" a stack of patents housed in any particular shoe. "Flipping through" consists of viewing the face page of a patent, in particular, the schematic drawing contained on that page.
Mitchell also testified that he performed a computer search at this time as well. Because intellectual property rights can only be granted to individuals, who can then in turn assign those rights to a company, Mitchell testified that he performed both an author and assignee computer search. Relying on the information provided by Carabotta, Mitchell assumed that Jean-Collet was a company rather than an individual and, as such, searched the name Jean hyphen Collet rather than searching as if Collet was the surname of the patent's author. He also searched the names Arquati and Papillon. Conducting his search in this manner, Mitchell testified that he found no patents on the Arquati/Papillon umbrella held by or assigned to companies by the name of Arquati, Jean-Collet or Papillon.
In a letter dated August 5, 1996, Mitchell advised Carabotta that he "could not find any patent which covers the Papillon structure" and concluded that the structure was "in the public domain." Carabotta testified that, based on this information, he formed Shademaster, Inc. in November 1996 for the purpose of manufacturing an identical version of the Arquati/Papillon umbrella. Carabotta did admit, however, that he had undertaken some initial steps in the manufacture of this umbrella prior to meeting with Mitchell and before he formed Shademaster.
As anticipated, demand for this umbrella was great and Carabotta enjoyed success in making and selling this product. After several months of manufacturing this product, however, Arquati filed a complaint against Carabotta and his companies alleging, inter alia, that Carabotta infringed patent number 4,606,366 (hereinafter referred to as the `366 patent), a patent granted to Jean Collet in August 1986 and assigned to Arquati in May 1997 that allegedly covered the Arquati/Papillon umbrella.[1] Carabotta eventually hired the law firm of Oldham and Oldham to represent him in this lawsuit, which was settled in January 1998 for $50,000 plus royalties payable to Arquati for Carabotta's remaining inventory.[2]
Carabotta thereafter filed suit against Mitchell and his law firm for legal malpractice in June 1998.[3] Mitchell impleaded Oldham Oldham for contribution. Just prior to trial, the trial court granted Oldham 
Oldham's motion for summary judgment and it was dismissed from the case.
A jury trial commenced in September 2000. Mitchell testified that he had touched the `366 patent while doing his subject-matter search but after looking at the drawing on the face page, discounted it as irrelevant. In particular, Mitchell testified that Carabotta relayed to him that a distinctive feature of the Arquati/Papillon umbrella is its vented top, which the drawing on the face page did not contain. Nor did the drawing otherwise resemble the drawings that Carabotta had given Mitchell. He testified that when he "flips through" patents during a subject-matter search, he confines his observations to the drawing on the face page. As such, he testified that he did not pay close attention to the title of the patent, the inventor's name or the abstract. It is undisputed that the face page contained the title "Protective Shelter, Such As An Umbrella With Offset Support" and that the name of the inventor was Jean Collet, who resided in France. He further testified that even if he had paid closer attention to those items on the face page of the patent, it was his opinion that the umbrella Carabotta manufactured did not infringe this patent.
Mark Watkins and Raymond Weber testified as expert witnesses for Carabotta. Both practice intellectual property law at their respective firms and both have impeccable credentials. It was Watkins, who is affiliated with Oldham Oldham, who represented Carabotta in the litigation between the latter and Arquati. Both attorneys opined that Mitchell deviated from the standard of care by confining his search to the drawing on the face page and thereby failing to identify the `366 patent as one that would pose a risk to Carabotta's plan to manufacture an identical Arquati/Papillon-style umbrella. Both further opined that a prudent practitioner would have noticed the inventor's name as well as the title of the patent and ordered a copy of the full patent in order to properly advise Carabotta of any associated risks.
Christopher Fagan testified as Mitchell's expert. He also is an intellectual property attorney with impeccable credentials. His testimony contrasted sharply with that of Carabotta's experts. In particular, he testified that it was reasonable for Mitchell to focus on the drawing on the face page based on the information given to Mitchell at the time of the search. This is so, he continued, because Mitchell was performing a subject-matter search where it is the structure of the invention, and not the name of the inventor, that is important.
The jury ultimately returned a unanimous verdict in Mitchell's favor. Carabotta thereafter filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for a new trial. Finding no basis for the former motion, the trial court denied the motion. It did, however, grant the motion for new trial. In the accompanying judgment entry, the court stated that it believed that the "verdict in this case is manifestly against the weight of the evidence, and that Mitchell's efforts fell well below the standard of care."
Mitchell is now before this court and assigns as error the granting of a new trial and, alternatively, the granting of third-party defendant Oldham Oldham's motion for summary judgment. Carabotta and Patio Den cross-appeal the denial of their motion for judgment notwithstanding the verdict.
 I. Direct Appeal A.
In their first assignment of error, appellants contend that the trial court erred in granting Carabotta's motion for a new trial on Carabotta's complaint for legal malpractice. Succinctly, they contend that there was sufficient evidence from which the jury could reach the verdict that it did and therefore a new trial is unwarranted.
Civ.R. 59(A)(6) provides that a new trial may be granted when the judgment is not sustained by the weight of the evidence. A reviewing court can only reverse the granting of such a motion upon a showing that the trial court abused its discretion. See Rohde v. Farmer (1970),23 Ohio St.2d 82, 90 citing Berry v. Roy (1961), 172 Ohio St. 422. Relying on Poske v. Mergl (1959), 169 Ohio St. 70, the Rohde court stated:
 It follows that, where there is a motion for a new trial upon the ground that the judgment is not sustained by sufficient evidence, a duty devolves upon the trial court to review the evidence adduced during the trial and to itself pass upon the credibility of the witnesses and the evidence in general. It is true that, in the first instance, it is the function of the jury to weigh the evidence, and the court may not usurp this function, but, when the court is considering a motion for a new trial upon the sufficiency of the evidence, it must then weigh the evidence. A court may not set aside a verdict upon the weight of the evidence upon a mere difference of opinion between the court and jury. Remington v. Harrington [1838], 8 Ohio 508; McGatrick v. Wason [1855], 4 Ohio St. 566. See Abernethy v. Wayne County Branch of State Bank of Ohio [1855], 5 Ohio St. 266. But, where a court finds a judgment on a verdict manifestly against the weight of the evidence, it is its duty to set it aside. Cleveland Pittsburgh Rd. Co. v. Sargent [1869], 19 Ohio St. 438.
Rohde, 23 Ohio St.2d at 92. Nonetheless, a new trial is unwarranted where the verdict is supported by competent, substantial and credible evidence. Verbon v. Pennese (1982), 7 Ohio App.3d 182, 183; see, also,C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 280. Thus, while a reviewing court must give deference to a decision of the trial court respecting the weight of the evidence, the appellate court must also conduct an inquiry sufficient to ensure that the trial court has not encroached on the jury's factfinding function. Bland v. Graves
(1993), 85 Ohio App.3d 644, 650.
With this standard in mind, we must determine whether the jury's verdict was supported by competent, substantial and credible evidence. In order to establish a cause of action for legal malpractice based on negligent representation, it was necessary for Carabotta to demonstrate that (1) Mitchell owed him a duty or obligation; (2) he breached this duty or obligation by failing to conform to the standard required by law; and (3) there existed a causal connection between the conduct complained of and the resulting damage or loss. See Vahila v. Hall
(1997), 77 Ohio St.3d 421, syllabus.
In this case, it is undisputed that Mitchell owed a duty of care to Carabotta individually as well as to Patio Den. What is disputed is whether competent, substantial and credible evidence was presented at trial supporting the jury's unanimous defense verdict or whether this verdict was manifestly against the weight of the evidence justifying the trial court's decision to grant a new trial.
The trial court concedes that the parties' expert witnesses, Raymond Weber and Christopher Fagan, are both exceptionally well qualified in the field of intellectual property.
 This case, therefore, became a battle between two qualified experts in the field of patent law. Raymond Weber testified that Mitchell fell below the standard of care because he failed to find and identify the 366 patent as one that posed a risk to manufacture, although it was easy to find. Christopher Fagan, testifying for Mitchell, did not deal with Mitchell's failure to carry out a reasonable search, but took the position that finding the 366 patent would not have mattered since Carabotta's umbrella did not infringe it, even though that is the patent under which the Arquati umbrella is still being produced.
Although acknowledging both parties' experts as highly qualified, the trial court discounted Fagan's testimony.
 His testimony did not spend much time on analyzing the methods used by Mitchell and Warren Low[4] to do a patent search for Carabotta, other than to say that everything they did was "within the standard of care." There was no attempt by Mr. Fagan to justify Mitchell's failure to identify the 366 patent as the one Carabotta badly needed to know about, even though the evidence shows that it was quite easy to find by everyone except Mitchell and Low, and that Mitchell actually did find it, held it in his hand, and failed to notice that it was important because he was just "looking at diagrams". (sic)
The trial court thereafter summarized Fagan's testimony as follows:
 In effect, [Fagan] opined that even if Mitchell had identified 366, it would not have made any difference because it does not accurately (sic) describe the Arquati product or the Shademaster, and thus the Shademaster does not infringe it.
Continuing, the court stated:
 But in the case at bar we have a defense expert who takes the position that regardless of how Mitchell conducted the search, his conduct did not fall below the standard of care because the patent he was looking for, (and should have found, in the opinion of the other experts) did not in Mr. Fagan's opinion, really make any difference.
The record does not support the conclusions drawn by the trial court. Fagan's testimony was extensive and comprehensive as to whether Mitchell adhered to the standard of care. In this regard, Fagan opined that it was reasonable for Mitchell (1) to rely on an outside searcher such as Warren Low to conduct a patent search; (2) to advise Carabotta about trade dress and the necessity to make design changes; and (3) to personally conduct a subject-matter search in Washington, D.C. after learning that Carabotta intended to make an identical copy of the Arquati/Papillon umbrella and that Arquati claimed to have the "only patented system."
Most importantly, Fagan spent considerable time on the mechanics of a subject-matter search. He discussed the organization of the PTO and its classification system. He discussed the practice of "flipping through" several hundred patents and the features on the face page of the patent that are important when conducting such a search. He discussed the manner in which results are corroborated by way of conducting an "integrity check." When asked if whether Mitchell conformed to the standard of care in looking only at the drawing on the face page of the `366 patent, Fagan answered:
 Based on the information that Mr. Mitchell had at the time he did his flipping, where he received from Mr. Low on two occasions confirmation that they could not find the three companies that were named, it was reasonable for Mr. Mitchell to focus on the picture as he did his flipping.
Fagan was then asked whether the standard of care required Mitchell to look at the title of the inventor in the abstract of each patent. Testifying that it did not, Fagan stated:
 * * * [W]hat Mr. Mitchell was doing at the time was a subject matter search. And what subject matter means is you are looking at the structure of the umbrella. You don't care who owns it. You are looking to see — if you can find the umbrella that's the subject of your search, and you'll decide later whether the specific owner is or it's (sic) not an issue. When you do the subject matter search you are looking for the subject and you don't care who owns it.
It is by comparing the drawing on the face page with the information provided to the searcher that determines whether the particular patent is pertinent, according to Fagan. Comparing the drawing on the face page of the `366 patent with those supplied to Mitchell by Carabotta, Fagan opined that the drawings did not resemble each other.
It is true that Fagan did testify to the effect that Mitchell did not breach the duty of care because neither the Arquati/Papillon umbrella nor the imitation made by Carabotta was covered by the claims of the `366 patent and, therefore, even if identified, the `366 patent is not infringed by either umbrella. As evidenced above, however, his testimony was not limited to that opinion and it was error for the trial court to conclude that his testimony could be reduced in that manner.
What remains then is the competing testimony of two highly qualified experts who have reached opposite conclusions given the same information. The jury having resolved the conflict, we cannot say that its resolution is against the manifest weight of the evidence because the jury had before it competent, substantial and credible evidence in reaching the decision that it did. It is our opinion that the trial court usurped the function of the jury by setting aside the jury's verdict because of a mere difference of opinion. This it cannot do. See Miller v. Paulson (1994), 97 Ohio App.3d 217, 227-228. As a result, the trial court acted in an unreasonable and arbitrary manner and, as such, abused its discretion in granting the motion for a new trial.
Mitchell's first assignment of error is well taken and is sustained.
 B.
In their second assignment of error, Mitchell contends that the trial court erred in granting the motion for summary judgment filed by Oldham 
Oldham on appellants' third-party complaint for contribution. We need not discuss this assigned error, however, due to our disposition of appellants' first assignment of error. See App.R. 12(A)(1)(c).
 II. Cross-Appeal
In their sole assignment of error on cross-appeal, Carabotta and Patio Den assert that they are entitled to judgment in their favor as a matter of law as to the issue of whether Mitchell breached the duty of care owed to Carabotta and Patio Den and, therefore, the trial court erred in denying their motion for judgment notwithstanding the verdict on this issue.[5] Succinctly, Carabotta and Patio Den contend that they are entitled to judgment in their favor because Mitchell presented no contrary expert testimony on this issue. We disagree.
When ruling on a motion for judgment notwithstanding the verdict, the trial court employs the same test applicable to a motion for directed verdict. That is, the evidence as adduced at trial and as borne by the record must be construed most strongly in favor of the party against whom the motion is made and where there is substantial evidence to support the non-movant's side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination when ruling upon either of the above motions. Posin v. ABCMotor Court Hotel, Inc. (1976), 45 Ohio St.2d 271, 275; see, also, Texlerv. D.O. Summers Cleaners Shirt Laundry (1998), 81 Ohio St.3d 677, 679. Appellate review of a motion for judgment notwithstanding the verdict isde novo. Schafer v. RMS Realty (2000), 138 Ohio App.3d 244, 257-258; see, also, Olive v. Columbia/HCA Healthcare Corp. (Mar. 9, 2000), Cuyahoga App. Nos. 75249 76349, unreported, 2000 Ohio App. Lexis 914.
It is true that Carabotta presented evidence that Mitchell was negligent in failing to identify the `366 patent during his patent search and, therefore, failed to adhere to the standard of care expected of an intellectual property attorney. As discussed in Section I(A), it is equally true that Mitchell presented evidence that he acted reasonably in conducting his patent search given the information Carabotta provided to him and, as such, Mitchell conformed to the standard of care. Thus, notwithstanding Carabotta's assertions to the contrary, opposing expert testimony was presented from which reasonable minds could reach different conclusions. It was not error, therefore, for the trial court to deny the motion for judgment notwithstanding the verdict.
Carabotta's cross-assignment of error is not well taken and is overruled.
 III. Conclusion
The judgment of the trial court granting Carabotta, Patio Den, Made for Shade and Shademaster a new trial on all issues is reversed and remanded with instructions to reinstate the jury's verdict while its judgment denying Carabotta and Patio Den's motion for judgment notwithstanding the verdict is affirmed.
This cause is affirmed in part, reversed in part and remanded for further proceedings consistent with the opinion herein.
It is, therefore, ordered that appellants recover from appellees costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH A. ROCCO, J. and JAMES J. SWEENEY, J., CONCUR.
[1] The record reveals that Arquati obtained the rights to this patent from Jean Collet as part of a settlement agreement between these two parties after Jean Collet sued Arquati for patent infringement. These rights were obtained, however, in May 1997, which is approximately eight months after Mitchell's legal services had been performed.
[2] This settlement was payable in installments. It is undisputed that Carabotta has not made all payments under the settlement agreement and that Arquati has agreed to indefinitely suspend further payment.
[3] Mitchell also initially counterclaimed for unpaid attorney fees, but dismissed this claim just prior to trial.
[4] Whether Warren Low met the standard of care is not an issue in this case.
[5] Carabotta and Patio Den are not appealing the denial of this motion as it pertains to appellees, Made for Shade and Shademaster.